UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THE CITY OF NEW YORK,

                    Plaintiff,

         — against —

NATIONAL RAILROAD PASSENGER
CORPORATION,

                  Defendant.
-------------------------------------------------------------X

**MEMORANDUM and ORDER**

06-CV-793 (SLT)(RER)

**TOWNES, United States District Judge:**

The City of New York ("the City") brought this diversity action to recover costs that it incurred to relocate electrical facilities of Amtrak from bridges owned by the City but spanning a railyard owned by Amtrak. The City relocated the electrical facilities to perform maintenance work on the bridges. Deeds executed in 1910 grant the City ownership of the bridges and an easement to continue and maintain the bridges and grant Amtrak the right to place attachments, such as the electrical facilities, on the bridges. Amtrak and the City dispute which party is obligated to bear the cost of relocating the electrical facilities. Amtrak also argues that liability by Amtrak is precluded by the Regional Rail Reorganization Act of 1973 ("Rail Act"), Pub. L. No. 93-236, 87 Stat. 985; the Rail Passenger Service Act, Pub. L. No. 91-518, 84 Stat. 1327 (1970); and the reorganization in bankruptcy of the predecessors of Amtrak. The City and Amtrak have filed motions for summary judgment, which this Court considers jointly.

## BACKGROUND

On June 21, 1907, two of Amtrak's predecessor railroads — the Pennsylvania, New York, and Long Island Railroad Company and the Long Island Railroad Company ("the railroads") — entered into an agreement with the City of New York to create the Sunnyside

Railyard in Queens, New York.  (Def. 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1).  The City agreed to close

several streets and sell the land to the railroads, and the railroads agreed to build several bridges

over the railyard, including the Honeywell Street Bridge, the Queens Boulevard Bridge, and the

Harold Avenue Bridge.  (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2).

> The 1907 agreement provides as follows:

> > Said Companies, or one of them will grant cede or cause to be
> > ceded to The City of New York by proper instruments in writing
> > perpetual easement or easements for the right to continue and
> > maintain the said viaducts or bridges over the following streets or
> > avenues as now laid out or proposed; and will thereby grant to the
> > City a perpetual easement or easements sufficient for the use and
> > control by the City of the said viaducts and bridges for the purpose
> > of police regulation and other control contemplated by the City
> > ordinances for the care of streets or highways.  Excepting and
> > reserving, however, to the said Companies the right to construct
> > and maintain, at its or their own expense, such connections
> > between the said viaducts or bridges, or any of them, and the
> > property of the said Companies, as shall not interfere with the use
> > of the said viaducts or bridges for street purposes . . . .

(1907 Agreement, section XV).  On June 26, 1907, the Pennsylvania, New York, and Long

Island Railroad Company merged with the Pennsylvania, New Jersey, and New York Railroad

Company to form the Pennsylvania Tunnel and Terminal Railroad.  (Def. 56.1 ¶ 4; Pl. 56.1 Resp.

¶ 4).

> The conveyances contemplated by the 1907 agreement were executed in December 1910.

(Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5).  In a deed of December 22, 1910 ("the 1910 deed"), the

railroads conveyed to the City the bridges and an easement to continue and maintain the bridges.

(Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7).  In a deed of December 28, 1910, the City conveyed the

closed streets to the railroads.  (Def. 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6).  In 1968, the Pennsylvania

Railroad system, of which the Pennsylvania Tunnel and Terminal Railroad was a part, merged

into the Penn Central Transportation Company ("Penn Central"). (Def. 56.1 ¶ 18; Pl. 56.1 Resp. ¶ 18).

On June 21, 1970, Penn Central, along with seven other railroads, filed a petition for bankruptcy and entered reorganization proceedings. (Def. 56.1 ¶ 19; Pl. 56.1 Resp. ¶ 19); *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 108, 95 S. Ct. 335, 341 (1974). In an effort to save the failing intercity passenger rail system, Congress passed the Rail Passenger Service Act and the Rail Act. The Rail Passenger Service Act authorized the creation of the National Railroad Passenger Corporation, a federally funded corporation better known as Amtrak. Pub. L. No. 91-518, 84 Stat. 1327 (1970). The Rail Act created the United States Railway Association, 45 U.S.C. § 711(a), and directed it to prepare a Final System Plan determining how the properties held by the railroads would be distributed, *id.* § 716. The Rail Act also created the Consolidated Rail Corporation, also known as Conrail, *id.* § 741(a), and directed that the properties in the Final System Plan be conveyed to Conrail, *id.* § 743(b). A Special Court was created to oversee the conveyance. *Id.* § 719(b). Properties related to passenger rail service were then conveyed from Conrail to Amtrak. *City of Phila. v. Consol. Rail Corp.*, 222 F.3d 990, 992 (D.C. Cir. 2000).

In a deed of April 1, 1976, the trustees of Penn Central conveyed Sunnyside Railyard to Conrail. (Def. 56.1 ¶ 23; Pl. 56.1 Resp. ¶ 23). In a deed executed later the same day, Conrail conveyed Sunnyside Railyard to Amtrak. (Def. 56.1 ¶ 24; Pl. 56.1 Resp. ¶ 24). Real property was conveyed by deed, and other property and interests, including executory contracts, were conveyed by a Bill of Sale and Assignment. (Def. 56.1 ¶ 27; Pl. 56.1 Resp. ¶ 27; Bill of Sale at

01123).  The Bill of Sale and Assignment did not specifically convey the 1907 agreement.  (Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29).

The bridges eventually fell into disrepair, and the Honeywell Street Bridge was closed to vehicular traffic in 1978 due to its deteriorated condition.  (Pl. 56.1 ¶ 12; Def. 56.1 Resp. ¶ 12).  In 1989, the City's Department of Transportation began a 10-year bridge rehabilitation program, which included the Honeywell Street Bridge, the Queens Boulevard Bridge, and the Harold Avenue Bridge.  (Def. 56.1 ¶¶ 31–32; Pl. 56.1 Resp. ¶¶ 31–32).  The rehabilitation contemplated the near total demolition and reconstruction of the bridges (Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 32), which required the relocation of the electrical facilities that had been attached to the bridges by the railroads (Pl. 56.1 ¶ 14; Def. 56.1 Resp. ¶ 14).  The electrical facilities included catenaries, which transmit electricity to trains in the railyard, and 60-cycle feeder lines, which provide electricity for purposes other than train propulsion.  (Def. 56.1 ¶¶ 13–16; Pl. 56.1 Resp. ¶¶ 13–16).  The catenaries were attached to all three bridges.  (Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15).  The 60-cycle feeder lines were attached only to the Honeywell Street Bridge.  (Def. 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 16).  The electrical facilities were attached to the bridges prior to the conveyance of the property to Amtrak.  (Def. 56.1 ¶ 37; Pl. 56.1 Resp. ¶ 37).

The City and Amtrak entered into two force account agreements to allow the rehabilitation project to proceed.  (Def. 56.1 ¶ 39; Pl. 56.1 Resp. ¶ 39).  The parties entered into the first force account agreement, which pertained to the Harold Avenue Bridge, in March 1992.  (Def. 56.1 ¶ 41; Pl. 56.1 Resp. ¶ 41).  Amtrak agreed to permit the City to undertake the rehabilitation of the bridge, to provide support services, and to relocate the electrical facilities

attached to the bridge.  (Def. 56.1 ¶ 42; Pl. 56.1 Resp. ¶ 42).  The City agreed to reimburse Amtrak for the entire cost of the work performed under the agreement, including the cost of relocating the electrical facilities.  (Def. 56.1 ¶ 43; Pl. 56.1 Resp. ¶ 43).

On November 16, 1999, the parties entered into a second force account agreement, which pertained to the Honeywell Street Bridge and the Queens Boulevard Bridge.  (Def. 56.1 ¶¶ 48–49; Pl. 56.1 Resp. ¶¶ 48–49).  As in the first agreement, Amtrak agreed to permit the City to undertake the rehabilitation of the bridges, to provide support services, and to relocate the electrical facilities.  (Def. 56.1 ¶ 49; Pl. 56.1 Resp. ¶ 49).  The City agreed to reimburse Amtrak for the cost of relocating the electrical facilities, but, unlike in the first agreement, the City reserved the right to bring an action to recoup the cost of relocating the electrical facilities.  (Def. 56.1 ¶ 50; Pl. 56.1 Resp. ¶ 50).  The City now sues to recoup the costs that it incurred when it paid for the relocation of the electrical facilities.

## STANDARD OF REVIEW

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  The moving party bears the burden of showing that there is no genuine issue of fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514 (1986).  If the movant meets this burden, the nonmovant must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e); *accord W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990).  The nonmovant cannot "'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' or defeat the motion through 'mere speculation or

conjecture.'"  *W. World*, 922 F.2d at 121 (citations omitted).  Moreover, the disputed facts must

be material to the issue in that they "might affect the outcome of the suit under the governing

law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  "When no rational jury could find in favor

of the nonmoving party because the evidence to support its case is so slight, there is no genuine

issue of material fact and a grant of summary judgment is proper."  *Gallo v. Prudential*

*Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Group,*

*Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).

      When a summary judgment motion involves the interpretation of a written instrument, "a

court should accord that language its plain meaning giving due consideration to 'the surrounding

circumstances [and] apparent purpose which the parties sought to accomplish.'"  *Thompson v.*

*Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) (quoting *William C. Atwater & Co. v. Panama R.R.*

*Co.*, 159 N.E. 418, 419 (1927)) (alteration in original).  When the language is ambiguous, "intent

becomes an issue of fact and summary judgment is inappropriate."  *Id.* (citing *Leberman v. John*

*Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir. 1989)).  "The mere assertion of an ambiguity does not

suffice to make an issue of fact."  *Id.*  "Ambiguity resides in a writing when — after it is viewed

objectively — more than one meaning may reasonably be ascribed to the language used."  *Id.*

(citing *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988); *Bethlehem Steel Co.*

*v. Turner Constr. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957)).  "Only where the language is

unambiguous may the district court construe it as a matter of law and grant summary judgment

accordingly."  *Id.* (citing *Am. Home Assurance Co. v. Balt. Gas & Elec.,* 845 F.2d 48, 50–51 (2d

Cir. 1988)).

# DISCUSSION

Our discussion is divided in five parts. First, the plain language of the 1910 deed requires Amtrak to bear the cost of relocating the electrical facilities. Second, the City is not barred by laches from enforcing the terms of the 1910 deed. Third, liability by Amtrak is not precluded by sections 24301(l) and 24301(g) of the Rail Passenger Service Act. Fourth, liability by Amtrak is not precluded by section 743(b)(2) of the Rail Act. Fifth, the obligation of Amtrak to pay for the relocation of the electrical facilities was not discharged in the bankruptcy proceedings of Penn Central.

A.      ***The Plain Language of the 1910 Deed Requires Amtrak To Bear the Cost of Relocating the Electrical Facilities.***

The City and Amtrak each argue that the 1910 deed obligates the other party to bear the cost of relocating the electrical facilities. This Court concludes that the plain language of the 1910 deed requires Amtrak to bear that cost.

The 1910 deed guarantees an easement in favor of the City to maintain the bridges and reserves to Amtrak the right to construct and maintain connections between the bridges, which are owned by the City, and railroad property as long as the connections do not interfere with the use of the bridges for street purposes:

> TOGETHER, *as to each and every [viaduct and bridge] thereof, with a perpetual easement and right to continue and maintain the same at its expense* as now constructed or as the [Thomson Avenue Bridge], hereinabove designated "C", and the [Queens Boulevard Bridge] may be widened as hereinafter authorized, over and upon the property respectively of [the railroads]; and together, as to each and every thereof [viaduct and bridge], with a perpetual easement sufficient for the use and control by the City of the said viaducts and bridges for the purpose of police regulation and other control contemplated by the City ordinances for the care of streets or highways including, as to the

7

[Thomson Avenue Bridge] and as to said viaduct or bridge and
approach described in said Agreement dated June 21, 1907, at
Article Third, Section II [the Queens Boulevard Bridge], the right
to the City to increase, at its own expense, and without interfering
with the operation of the railroads and appurtenances of [the
railroads], the width of said viaducts each to one hundred feet . . . .

EXCEPTING AND RESERVING, however, to each of the
said Railroad Companies, their respective successors and assigns,
as follows, to wit (1) *the right to construct and maintain, at its or
their own expense, such connections between the said viaducts or
bridges, or any of them, as now constructed or as widened, and the
property of said Railroad Companies or either of them, as shall
not interfere with the use of the said viaducts or bridges for street
purposes* . . . .

TO HAVE AND TO HOLD said viaducts or bridges and
the easements hereby granted unto the City of New York and its
successors forever, Excepting and Reserving as aforesaid and
subject to all the rights and privileges of Pennsylvania Tunnel and
Terminal  Railroad Company and of the Long Island Railroad
Company or both or either of them to construct, maintain and
operate railroads with appurtenances . . . .

(1910 Deed at 3–4) (emphases added).

The plain language of the 1910 deed requires Amtrak to bear the cost of relocating the

electrical facilities.  The deed grants the railroads the right to build connections, such as

catenaries and 60-cycle feeders, between the bridges and railroad property, but only "such

connections . . . as shall not interfere with the use of the said viaducts or bridges for street

purposes."  (1910 Deed at 4).  The presence of Amtrak's electrical facilities on the bridges

prevents the renovation of the bridges, and, as a result, the electrical facilities interfere with the

use of the bridges for street purposes and the easement to continue and maintain the bridges.

Amtrak argues that the City should bear the cost of relocating the electrical facilities

because the 1910 deed prevents the City from interfering with the operation of the railroads.  The

deed, however, specifically prohibits connections, such as the electrical facilities, from interfering with the use of the bridges for street purposes. Under the explicit terms of the deed, bridge maintenance has priority over the electrical facilities. The general prohibition on interference with the operation of the railroads does not vitiate the express condition that the electrical facilities not interfere with the use of the bridges for street purposes.

Amtrak also argues that, under the terms of the 1910 deed, it has not interfered with the maintenance of the bridges or their use for street purposes because the complete reconstruction of the bridges, and by extension the relocation of the electrical facilities, became necessary only because the City allowed the bridges to fall into disrepair. This argument fails. There is no dispute that the maintenance of the bridges was necessary for the use of the bridges for street purposes and that the maintenance could not be performed without the relocation of the electrical facilities. The 1910 deed contains no language imposing on the City an obligation to maintain the bridges with any particular frequency.

**B.      *Laches Does Not Bar the City from Enforcing the Terms of the 1910 Deed.***

Amtrak argues that laches bars the City from objecting to the placement of the electrical facilities because more than seventy years have passed since the electrical facilities were attached to the bridges. The railroads attached the facilities in the 1930s, and the City did not object to the placement of the electrical facilities before it brought this action. (Def. 56.1 ¶¶ 13–17; Pl. 56.1 Resp. ¶¶ 13–17). This Court nonetheless concludes that laches does not apply.

Amtrak cites three decisions in which New York courts have applied laches to bar the delayed enforcement of restrictions contained in deeds, but each is distinguishable. In *Zaccaro v. Congregation Tifereth Israel of Forest Hills, Inc.*, neighborhood property owners sought to

enforce against a religious congregation a restriction on the land limiting it to residential use. 228 N.E.2d 772, 772–73 (N.Y. 1967). The Court of Appeals held that the plaintiffs were precluded from enforcing the restriction against the congregation, which had recently purchased the property, because the land had been used for religious purposes for the previous eighteen years. *Id.* at 773. In *Freer v. Poncic*, the property owner sought to enforce against the operator of a camping trailer park a restriction on the land limiting it to residential use. 568 N.Y.S.2d 480, 480 (App. Div. 1991). The Appellate Division held that the plaintiff was precluded from enforcing the restriction because he had owned the land for fifteen years without taking action despite the park operator's open and continuous use of the land for nonresidential purposes. *Id.* at 480–81. In *Delamater v. Rybaltowski*, neighboring property owners sought to enforce a prohibition on the subdivision of nearby property. 557 N.Y.S.2d 574, 574 (App. Div. 1990). The Appellate Division held that the plaintiffs were precluded from enforcing the prohibition because the improper subdivision of the property occurred twenty-five years earlier. *Id.* Unlike the plaintiffs in *Zaccaro*, *Freer*, and *Delameter*, the City of New York is not belatedly asserting its rights. The electrical facilities did not interfere with the maintenance of the bridges and their use for street purposes until the City undertook to rehabilitate the bridges.

C.      ***Liability by Amtrak for the Relocation of the Electrical Facilities Is Not Precluded by Sections 24301(l) and 24301(g) of the Rail Passenger Service Act.***

Amtrak argues that sections 24301(l) and 24301(g) of the Rail Passenger Service Act prevent the imposition of liability on Amtrak for the relocation of the electrical facilities.

Section 24301(l) exempts Amtrak from government taxes and fees:

> (l) Exemption from taxes levied after September 30, 1981. – (1) In general. – Amtrak, a rail carrier subsidiary of Amtrak, and any passenger or other customer of Amtrak or such subsidiary, are

> exempt from a tax, fee, head charge, or other charge, imposed or
> levied by a State, political subdivision, or local taxing authority on
> Amtrak, a rail carrier subsidiary of Amtrak, or on persons traveling
> in intercity rail passenger transportation or on mail or express
> transportation provided by Amtrak or such a subsidiary, or on the
> carriage of such persons, mail, or express, or on the sale of any
> such transportation, or on the gross receipts derived therefrom after
> September 30, 1981. In the case of a tax or fee that Amtrak was
> required to pay as of September 10, 1982, Amtrak is not exempt
> from such tax or fee if it was assessed before April 1, 1997.

49 U.S.C. § 24301(l).

Section 24301(l) does not prohibit liability by Amtrak for the relocation of the electrical

facilities. It does not "exempt Amtrak from all payments to state and local governments." *Nat'l*

*R.R. Passenger Corp. v. City of N.Y.*, 882 F.2d 710, 714 (2d Cir. 1989). Furthermore, it does not

suggest that "Amtrak [may] use property, whether private or public, without paying for the right

to use it." *Id.* at 715. The City owned the bridges and had been granted an easement to continue

and maintain the bridges. The 1910 deed granted Amtrak the right to attach the electrical

facilities to the bridges as long as the facilities did not interfere with the City's use of the bridges

for street purposes. Imposing liability on Amtrak for the cost of discontinuing interference with

the property rights of the City does not constitute a tax or fee in violation of section 24301(l).

Section 24301(g) provides as follows:

> (g) Nonapplication of rate, route, and service laws. – A State or
> other law related to rates, routes, or service does not apply to
> Amtrak in connection with rail passenger transportation.

49 U.S.C. § 24301(g). Section 24301(g) does not prohibit liability by Amtrak for the relocation

of the electrical facilities. Amtrak provides no authority for the proposition that the City's

attempt to prevent Amtrak from encroaching upon its property rights somehow constitutes a law

relating to rates, routes, or service.

**D.**     ***Liability by Amtrak for the Relocation of the Electrical Facilities Is Not Precluded by Section 743(b)(2) of the Rail Act.***

Amtrak argues that the obligations stemming from the 1907 agreement and the 1910 deed were extinguished by the Rail Act.  The Rail Act required that property transferred from Penn Central to Conrail during the bankruptcy proceedings of Penn Central be conveyed free and clear of liens and encumbrances:

> All rail properties conveyed to the Corporation or any subsidiary thereof the respective profitable railroads operating in the region, States, and responsible persons under this section *shall be conveyed free and clear of any liens or encumbrances*, but subject to such leases and agreements as shall have previously burdened such properties or bound the owner or operator thereof in pursuance of an arrangement with any State, or local or regional transportation authority under which financial support from such State, or local or regional transportation authority was being provided on January 2, 1974, for the continuance of rail passenger service or any lien or encumbrance of no greater than 5 years' duration which is necessary for the contractual performance by any person of duties related to public health or sanitation.  Such conveyances shall not be restrained or enjoined by any court.

45 U.S.C. § 743(b)(2) (emphasis added).  Section 743(b)(2) reflected a congressional intent to insure that Amtrak would not be burdened by the financial obligations of the bankrupt transferor railroads.  *See, e.g.*, *Howard v. Penn Cent. Transp. Co.*, 87 F.R.D. 342, 347–48 (D.C. Ohio 1980).

Because this Court bases its holding on the terms of the 1910 deed, rather than the 1907 agreement, this Court does not consider whether the Rail Act precludes enforcement of the 1907 agreement.[1]  To the extent that Amtrak argues that the Rail Act prohibits enforcement of the

---

[1] Regardless, the language of the 1907 agreement and the 1910 deed are similar in all relevant respects.

1910 deed as it pertains to limitations on attachments to the bridges (Def. Reply Br. 9–10 & n.9), this argument also fails. As explained below, the City's ownership of the bridges and its easement to continue and maintain the bridges survived the Rail Act, and the condition on attachments to the bridges did not constitute a restrictive covenant separate from the property rights of the City.

In addition to the City's ownership of the bridges themselves, the City's easement to continue and maintain the bridges survived the Rail Act. Neither party argues that the Rail Act extinguished the City's easement to continue and maintain the bridges, and this Court agrees with the assessment of the parties. Congress passed the Rail Act in response to the bankruptcy of eight major railroads, which threatened the viability of the United States rail transportation system. *Blanchette*, 419 U.S. at 108, 95 S. Ct. at 341. The Rail Act reorganized the railroads into "a single, viable system operated by a private, for-profit corporation," which would not have been possible under section 77 of the Bankruptcy Act. *Id.* at 109, 95 S. Ct. at 342.

Because the Rail Act was passed to resolve a bankruptcy proceeding, this Court analogizes to the principles of bankruptcy law to interpret the intentions of Congress. As Judge Platt has explained, a sale in bankruptcy "free and clear of liens and other interests" does not affect restrictions of record that run with the land, such as easements. *Silverman v. Ankari (In re Oyster Bay Cove, Ltd.)*, 196 B.R. 251, 255 (E.D.N.Y. 1996). "[A]bsent the consent of the owner of the easement or the easement being in bona fide dispute, the Bankruptcy Code does not even allow the Bankruptcy Court to authorize a sale of the property 'free and clear' of an easement." *Id.* at 255–56 (citing 11 U.S.C. § 363(f)). Although the Rail Act predated section 363(f) of the Bankruptcy Code, there is no indication that the Bankruptcy Code altered the effect on

easements of a transfer free and clear of liens and encumbrances.  *See* 3 Collier on Bankruptcy ¶ 363.06 (15th ed. 2008) ("The [Bankruptcy] Code makes no material change to the cases decided under the Bankruptcy Act with respect to sales free of liens.").

Amtrak seems to argue that if, as the City maintains, the restriction on attachments constituted a restrictive covenant, the restriction would not have survived the Rail Act.[2]  (Def. Reply Br. 10 & n.9).  This argument fails because the restriction did not constitute a restrictive covenant.  A restrictive covenant is defined as "[a] private agreement, usu[ally] in a deed or lease, that restricts the use or occupancy of real property, esp[ecially] by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put."  Black's Law Dictionary 393 (8th ed. 2004).  The 1910 deed granted the City ownership of the bridges and an easement to continue and maintain the bridges.  (1910 Deed at 2–4).  The deed also granted Amtrak the right to place attachments, such as the electrical facilities, on bridges owned by the City.  (1910 Deed at 4).  The provision prohibiting the attachments from interfering with the use of the bridges for street purposes merely made explicit that the grant to Amtrak of a right to place attachments on City property did not by implication convey a right to interfere with the City's easement.  Because the easement and the City's ownership of the bridges survived the Rail Act, the obligation of Amtrak not to interfere with the maintenance of the bridges or their use for street purposes also survived.

---

[2] In another memorandum of law, Amtrak argues that the restriction on attachments did not constitute a restrictive covenant.  (Def. Resp. Br. 8–12).  This Court does not express any opinion regarding the effect of the Rail Act on restrictive covenants.

*E.*     ***The Obligation of Amtrak To Pay for the Relocation of the Electrical Facilities Was Not Discharged in the Bankruptcy Proceedings of Penn Central.***

Amtrak also argues that its obligation not to interfere with the maintenance of the bridges and their use for street purposes was discharged in the bankruptcy proceedings of Penn Central. According to Amtrak, because the 1907 agreement was not conveyed to Amtrak in the Bill of Sale and Assignment, it remained with the Penn Central estate and was discharged under the plan of reorganization. (Def. Resp. 21–22). This argument fails for two reasons. First, this Court bases its analysis on the 1910 deed rather than the 1907 agreement. Second, to the extent that Amtrak suggests that the restriction on bridge attachments was extinguished in the bankruptcy proceedings of Penn Central, the Court does not concur. As explained above, the restriction survived the Rail Act and was conveyed to Amtrak. The plan of reorganization for Penn Central could not have affected the property already conveyed to Amtrak.

## CONCLUSION

For the reasons set forth above, the plaintiff's motion for summary judgment is **granted**. The defendant's motion for summary judgment is **denied**. The parties are directed to submit a proposed judgment.

Dated: Brooklyn, New York
         December 9, 2008

*Sandra L. Townes*
SANDRA L. TOWNES
United States District Judge